IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ELIZABETH ABE, *et al.*,
                    Plaintiffs,

v.                                                      Civil Case No. 3:22cv11

VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY,
                    Defendant.

## OPINION

The female plaintiffs—Nicole Tilley, June Erwin, Sharon Allen, and Elizabeth Abe—contend that their employer, the Virginia Department of Environmental Quality ("DEQ"), violated the Equal Pay Act ("EPA") amendments to the Fair Labor Standards Act ("FLSA") by paying them lower wages than comparable male employees for equal work, requiring equal effort, skill, and responsibility.[1] The plaintiffs identify their comparators as follows:

| Plaintiff | Comparator(s) |
|---|---|
| Nicole Tilley | 1. Mark Allen Patton |
| June Erwin | 1. David Kinsey<br>2. Michael Kelly |
| Sharon Allen | 1. David Kinsey<br>2. Michael Kelly |
| Elizabeth Abe | 1. Ian Edwards<br>2. Jason McCroskey |

Two motions currently pend before the Court. DEQ has moved for summary judgment. DEQ assumes without conceding that the plaintiffs have made their *prima facie* showing for the plaintiffs and their comparators, but it argues that "factors other than sex" explain the differences

---

[1] This case follows three other, related cases filed in this Court. *See McGee v. DEQ*, No. 3:21cv268; *Abel v. DEQ*, No. 3:21cv803; *Polak v. DEQ*, No. 3:20cv270, *aff'd*, 57 F.4th 426 (Jan. 17, 2023).

between the salaries of the plaintiffs and their comparators.  (ECF No. 39.)  The plaintiffs have moved to strike certain factors other than sex that DEQ relies on as part of its affirmative defenses because the plaintiffs allege that DEQ disclosed the factors late and did not sign the disclosure when supplementing its discovery responses.  (ECF No. 41.)

The Court will first consider the motion to strike before turning to the motion for summary judgment.  As explained below, the Court will deny the motion to strike but will grant the plaintiffs leave to perform limited discovery related to Kinsey's status under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") and his military leave.  The Court will grant in part the motion for summary judgment.  The Court agrees that DEQ has established that the pay discrepancy between the following plaintiffs and their comparators in fact resulted from a factor other than sex, and the plaintiffs have failed to adequately rebut that conclusion: (1) Erwin and Kelly; (2) Allen and Kelly; (3) Abe and McCroskey; and (4) Abe and Edwards.  The Court concludes, however, that, on this record, DEQ has failed to establish that a factor other than sex in fact explains the pay discrepancy between the following plaintiffs and certain comparators: (1) Tilley and Patton; (2) Erwin and Kinsey; and (3) Allen and Kinsey.  As such, the Court will deny DEQ's motion in part and allow this case to proceed as to Tilley and Patton, Erwin and Kinsey, and Allen and Kinsey.  The Court will grant DEQ's motion in all other respects.

## I. <u>MOTION TO STRIKE</u>

In an EPA case, when a plaintiff has established her *prima facie* showing of a pay disparity, the burden of production and persuasion shifts to the defendant to show that a statutory defense—here, a factor other than sex—explains the pay disparity. *See Polak v. DEQ*, 57 F.4th 426, 430 (4th Cir. 2023).  The plaintiffs have moved to strike certain newly asserted factors other than sex

2

DEQ has raised as affirmative defenses in its motion for summary judgment.[2]  They argue that

DEQ cannot rely on the newly asserted factors because (1) DEQ did not sign the supplemental

responses asserting those factors at issue under oath, in violation of Federal Rule of Civil Procedure

33(b); and (2) DEQ did not timely disclose the factors at issue, in violation of Federal Rule of Civil

Procedure 26(e).  For the reasons stated below, the Court will deny the motion to strike but will

grant the plaintiffs leave to perform limited additional discovery about Kinsey's USERRA status

and his military leave.

### A.  Relevant Background

In its Answer filed on August 18, 2021, DEQ asserted that,

> [t]o the extent Plaintiffs establish that they were paid at a rate less than the rate at which Defendant paid wages to male employees for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which were performed under similar working conditions, any such differential was because of 1) a seniority system; 2) a merit system; or 3) a differential based on any other factor other than sex.

(ECF No. 5, at 24 (Sixth Affirmative Defense).)  DEQ also asserted that "[a]ll actions taken by

Defendant with regard to Plaintiffs' rate of pay were for good cause and in good faith and were

based on reasonable factors other than gender."  (*Id.* (Seventh Affirmative Defense).)

On January 5, 2021, DEQ attached a chart listing the factors other than sex for each

comparator (the "FOTS Chart") to its interrogatory response identifying the factors that explain

the pay discrepancies.  (ECF No. 42-4, at 2; ECF No. 42-5.)  Renee Wilson, DEQ Director of

Human Resources & General Services, signed the interrogatory responses under oath.  Throughout

discovery, DEQ sent the plaintiffs updated versions of the FOTS Chart by email.  Specifically,

DEQ submitted an updated FOTS Chart on July 8, 2022; August 29, 2022; October 6, 2022; and

---

[2] The plaintiffs challenge some, but not all, of the factors DEQ relies on in its motion for summary judgment.

October 12, 2022. (*See* ECF Nos. 42-7, 42-9, 46-2, 46-4.)  The FOTS Chart was very fluid: DEQ added and deleted comparators for different plaintiffs, added and deleted factors, and deleted plaintiffs.  DEQ sent each new FOTS Chart iteration to the plaintiffs by email and did not include a signature page.

The plaintiffs now seek to strike the following factors listed in the October 12 FOTS Chart:

- **Ian Edwards:** (1) Internal Alignment 11/25/01; (2) Internal Alignment 11/10/05; (3) Promotion 1/10/06; and (4) 5 for 5 Salary Adjustment 6/25/11

- **Jason McCroskey:** (1) Career Path 3/25/10, and (2) 5 for 5 Salary Adjustment 6/25/11

- **Michael Kelly:** (1) Prior Salary History, and (2) Erwin was not ESII until 04/10/19 (previous role was Admin and Office Spec. III)

- **Mark Allen Patton:** (1) Relevant Experience

- **David Kinsey[3]:** (1) 5 for 5 Salary Adjustment 9/25/11; (2) Career Path 2/25/14; (3) Kinsey was Environmental Manager I from 1998-2009; (4) Erwin was not ESII until 04/10/19 (previous role was Admin and Office Spec. III); and (5) Kinsey's USERRA/Military Leave

Yet DEQ included nearly all these factors in earlier versions of the FOTS Chart.  For example, DEQ added "USERRA/Military Leave" to the October 6 FOTS Chart.  The only factor that first appeared on the October 12 FOTS Chart was Michael Kelly's "Prior Salary History." (*Compare* ECF Nos. 42-5 (January 5 FOTS Chart), 42-7 (July 8 FOTS Chart), 46-2 (August 29 FOTS Chart), and 46-4 (October 6 FOTS Chart), *with* Ex. 42-9 (October 12 FOTS Chart).)

Moreover, the plaintiffs did not object to the form of DEQ's supplemental FOTS Chart during discovery, nor did they file any discovery motions.  The plaintiffs took Kinsey's deposition

---

[3] The January 5 FOTS Chart did not include Kinsey as a comparator for either Allen or Erwin, yet the plaintiffs only contest some of the factors related to Kinsey.

on October 4, 2022; Wilson's deposition on October 7, 2022; and Kelly's deposition on October 12, 2022. On October 25, 2022, DEQ produced fourteen pages related to Kinsey's military leave. DEQ filed its motion for summary judgment two days later, which led to the instant motion. Within two weeks after the plaintiffs filed their motion to strike, DEQ served a verified supplemental interrogatory response that included the October 12, 2022, FOTS chart. The plaintiffs did not file a reply brief.

### B. Signature Requirement

#### 1. Legal Standard

Federal Rule of Civil Procedure 33(b) requires that "[e]ach interrogatory . . . , to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). In addition, the person responding to discovery "must sign" the answers. Fed. R. Civ. P. 33(b)(5). Further,

> "[U]nsworn, unsigned answers to interrogatories do not meet the requirements of F[ederal] R[ule of] Civ[il] P[rocedure] 56(e)," now Rule 56(c)(4). *Roberts v. Gen. Elec. Co.*, 1 F.3d 1234, at \*1 n.3 (4th Cir. 1993) (unpublished table opinion) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 945 n.9 (4th Cir. 1992)). When ruling on a motion for summary judgment, a district court may properly decline to consider a party's interrogatory responses when the responses "were not properly attested." *Kincaid v. Anderson*, 681 Fed. Appx. 178, 181 (4th Cir. 2017) (holding that the district court "did not abuse its discretion" by refusing to consider a plaintiff's improperly attested responses to interrogatories when ruling on the defendants' motions for summary judgment).

*Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 831 (E.D. Va. 2017) (alterations in original).

Federal Rule of Civil Procedure 26(g) likewise requires that "every discovery request, response, or objection . . . be signed by at least one attorney of record in the attorney's own name . . . and must state the signer's address, e-mail address, and telephone number." Fed. R. Civ. P. 26(g)(1). But Rule 26 also provides an opportunity for a party to cure the defect: "[o]ther parties

5

have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it *unless a signature is promptly supplied after the omission is called to the attorney's or party's attention*." Fed. R. Civ. P. 26(g)(2) (emphasis added).

*2. Analysis*

The plaintiffs first contend that the Court must strike DEQ's newly disclosed factors because DEQ did not sign the FOTS Chart when it submitted each updated version by email. The plaintiffs reason that they "do not know who the author of the document is or when it was created," and they contend that the Rules mandate that the Court strike the unsigned supplemental interrogatory responses. (ECF No. 42, at 8.)

DEQ argues that each iteration of the FOTS Chart it emailed mirrored the format of the FOTS Chart it attached to the verified January 5 interrogatory responses, so it "strains reason" that the plaintiffs do not know the author or date created of the October 12, 2022, FOTS Chart. (ECF No. 46, at 4.) In any event, DEQ served "a verified supplemental interrogatory response attaching its October 12[th] FOTS Chart" at the same time it filed its response to the motion to strike and therefore cured any purported defect. (*Id.* at 5.)

Rule 33 required DEQ to sign the supplemental responses. Nevertheless, despite receiving multiple unsigned supplements, the plaintiffs accepted the FOTS Chart throughout the course of discovery, never filed a motion to compel versions of the FOTS Chart with signatures, and did not object to the form of the supplement until after DEQ filed its motion for summary judgment. And, the plaintiffs relied on at least one unsigned FOTS Chart during depositions. (*See, e.g.*, ECF No. 42-1, Kelly Tr. 34:8–13, 34:16–35:3 (discussing the 2011 five-for-five salary adjustment, which DEQ first included on the July 8 unsigned FOTS Chart).) The plaintiffs cannot have it both ways.

6

In any event, DEQ timely corrected the omission, as permitted by Rule 26(g)(2).  Thus, the Court will not strike the affirmative defenses based on DEQ's failure to sign its supplemental responses.

### C.  *Untimely Disclosure*

#### 1. *Legal Standard*

Federal Rule of Civil Procedure 26 requires parties to supplement their discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  Rule 37 provides that "a party [who] fails to provide information . . . as required by Rule 26 . . . (e), . . . is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

When considering whether to exclude information as required by Rule 37, the Court should consider the following guideposts:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (quoting *S. States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003)).  The burden of establishing these factors falls on the non-disclosing party—here, DEQ.  *Id.*  The Court, however, need only "be guided by" these factors; it need not "tick through each of the *Southern States* factors."  *Id.*

#### 2. *Analysis*

The plaintiffs contend that DEQ's late disclosure hindered their "ability to contest DEQ's evidence."  (ECF No. 42, at 10.)  DEQ responds that it timely disclosed most factors at issue before

7

October 12, 2022; the Court has not set a discovery cut-off or trial date, meaning the plaintiffs have ample opportunity to cure any surprise without disrupting the trial; and the importance of this evidence to DEQ "is unquestionable." (ECF No. 46, at 7.)

The Court mostly agrees with DEQ. The defendants disclosed all but one factor—Kelly's prior salary—in a FOTS Chart before October 12, 2022. Thus, DEQ did not surprise the plaintiffs with the information in the October 12 FOTS Chart. Further, DEQ emailed the plaintiffs multiple iterations of the FOTS Chart. The plaintiffs could have filed a motion to compel at any time during discovery if they had concerns about the unverified or evolving nature of the FOTS Charts. And even if the plaintiffs had never seen those factors before October 12, with no trial date set, they still had more than two weeks to file motions to extend the summary judgment deadline or response deadline. DEQ's summary judgment motion relies on several of its purportedly late disclosed defenses and therefore are important in this litigation.

For the most part, DEQ has provided a reasonable explanation for why it supplemented its interrogatory response in the manner and time that it did, this case has not proceeded to trial, and the delay in disclosing the factors minimally prejudiced the plaintiffs. The plaintiffs' only argument that has merit relates to the USERRA/military leave factor for Kinsey. Although DEQ disclosed that defense on October 6, 2022—six days before the October 12 FOTS Chart at issue— it did not disclose it until two days after the plaintiffs deposed Kinsey on October 4, 2022. DEQ seems to imply the timing posed no problem because it made the disclosure before Wilson's deposition. Yet it still prevented the plaintiffs from asking Kinsey about the affirmative defense DEQ raises about him in its motion for summary judgment. And it did not produce discovery

related to this factor until two days before DEQ moved for summary judgment, significantly limiting the time the plaintiffs had to review and consider these documents.

Nevertheless, as explained below, the Court concludes that a genuine dispute of material fact exists as to the pay disparity between Erwin, Allen, and Kinsey, and the Court will not grant summary judgment based on that defense. The plaintiffs have therefore suffered minimal prejudice at this juncture. To cure any prejudice this late disclosure would otherwise cause at trial, the Court will require DEQ to produce any remaining documents related to this issue and will allow the plaintiffs to take additional, limited depositions of Kinsey and Wilson about this defense.

## II. MOTION FOR SUMMARY JUDGMENT

The Court will next turn to DEQ's motion for summary judgment. For clarity, the Court will set forth its findings of fact and its analysis of each plaintiff and her comparators in separate sections. Erwin and Allen share comparators, so the Court will consider those plaintiffs together.

### A. Legal Standard[4]

The plaintiffs contend that DEQ violated the EPA, 29 U.S.C. § 206(d).[5] To establish a claim under the EPA, "the plaintiff 'must make an initial (i.e., prima facie) showing of three

---

[4] Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Likewise, "[a] dispute is genuine if 'a reasonably jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

Upon a motion for summary judgment, the court draws all reasonable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. But when the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing "affidavits" or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

elements: (1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions.'" *Polak*, 57 F.4th at 429–30 (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019)). The *prima facie* showing "permits an inference that a pay disparity was based on sex discrimination," at which point "the burdens of production and persuasion shift to the defendant-employer to show that the wage differential was justified by one of the statutory defenses." *Id.* at 430 (quoting *Evans v. Int'l Paper Co.*, 936 F.3d 183, 196 n.6 (4th Cir. 2019)). "These affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). Further, the defendant must establish "that the proffered reasons *do in fact* explain the wage disparity." *Id.* at 121. In other words, "once the plaintiff has established a prima facie case the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense so convincingly that a rational jury could not have reached a contrary conclusion." *Id.* "If this burden is successfully carried by the employer, the plaintiff's claim must fail unless the plaintiff can satisfactorily rebut the defendant's evidence." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995).

---

[5] "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1).

DEQ does not argue that the plaintiffs have failed to establish their *prima facie* case, so the Court's analysis will focus on DEQ's proffered reasons for the wage discrepancies.

### B. Findings of Facts Regarding DEQ

DEQ serves as the environmental agency of the Commonwealth of Virginia, with its main office in Richmond, Virginia. (ECF No. 40 ¶ 1.) DEQ has six additional "regional offices" around the state. (*Id.*) The Department of Human Resource Management ("DHRM") serves as the central human resources agency for the Commonwealth and "establishes the compensation policies applicable to [DEQ] employees." (*Id.* ¶ 2.) Beginning in September 2000, DHRM policy directed DEQ to consider thirteen pay factors when setting a new employee's starting wage. (*Id.* ¶ 3.) The factors included: "(1) agency business needs, (2) budget implications, (3) the employee's duties and responsibilities, (4) internal salary alignment[,] (5) the knowledge, skills, and abilities required" to perform the job, "(6) the long-term impact on the agency, (7) market availability . . . , (8) employee performance, (9) salary reference data (a composite of relevant salary information), (10) total compensation . . . , (11) training, certification, and license requirements . . . , (12) work experience and education," and (13) current salary. (*Id.*) "Current salary" was "the primary factor." (*Id.* ¶ 6.) DEQ used "Pay Bands" to determine salary ranges for classified state employees and set the minimum and maximum salaries for each position. (*Id.* ¶ 4.) "Under the 2000 Compensation Plan, starting pay was negotiable from the minimum of the assigned salary range . . . up to fifteen percent (15%) of the applicant's current salary." (*Id.* ¶ 5.)

DEQ employees may receive pay increases in various ways. For example, "DEQ employees . . . can receive raises by advancing on DEQ's career path (Entry to Senior II) based on satisfying criteria related to their level core competency." (*Id.* ¶ 8.)

### C.  Nicole Tilley & Mark Allen Patton

#### 1.  *Facts*

##### a.  Nicole Tilley

Tilley received a Bachelor of Science degree in 2008 from Hollins University; took Masters course work in 2014; and, before working for DEQ, worked for her father "managing, collecting, storing, and disposing of oil and other waste in accordance with Virginia's regulations." (ECF No. 43-23 ¶¶ 2-3 (Pls.' Ex. 25).)  Tilley began working at DEQ on January 10, 2016, as an entry-level Environmental Specialist II (Inspector – Waste) in DEQ's Blue Ridge Regional Office ("BRRO").  DEQ based Tilley's $45,000 starting salary on her prior salary of $25,000. (ECF No. 40 ¶ 10.a).  The parties disagree about whether DEQ also based her starting salary on her "minimal prior experience," but the "DEQ Employment Decision" document cited to by DEQ, (ECF No. 40-3, at 78 (DEQ Ex. 3, Att. Z)), indicates it hired her as entry level.  Between January 2016 and July 2022, Tilley received six salary increases—four General Assembly-passed salary increases, one career path competency adjustment (Entry to Senior), and one in-band adjustment. (ECF No. 40 ¶ 10.b.)  When her comparator, Mark Allen Patton, joined DEQ in April 2019, Tilley made $48,668. (ECF No. 40-3, at 82 (DEQ Ex. 3, Att. AA).)  On June 10, 2019, Tilley received a salary increase to $51,101. (ECF No. 40 ¶ 10.b.)  As of July 2022, Tilley earned $59,156. (*Id.*)  On October 10, 2022, Tilley transitioned to a Solid Waste position in her same office, with an annual salary of $65,000. (ECF No. 43-23 (Pls.' Ex. 25 ¶ 8).)

### b. Mark Allen Patton[6]

Patton began working at DEQ as an Environmental Specialist II (Inspector Senior – Waste – SW) at DEQ's BRRO on April 25, 2019. (ECF No. 40-3, at 84 (DEQ Ex. 3, Att. BB).) Patton previously worked at BAE Systems as a Senior Environmental Specialist from October 2014 until DEQ hired him. (*Id.* at 14, ¶ 49.) He had no DEQ experience. (*Id.* at 83.) At BAE Systems, Patton made $68,619. (*Id.*) His starting salary at DEQ was $59,000. (*Id.* at 84.)

### 2. *Analysis*

DEQ asserts two reasons for why Patton made $59,000 when he started in 2019 while Tilley made only $45,000 in 2016: Patton had more experience and a higher prior salary than Tilley. (ECF No. 40, at 19.) First, DEQ contends that Tilley "had no direct job-related experience," (*id.*), while Patton had significant, related experience at BAE Systems OSI-Radford Army Ammunition Plant as a Senior Environmental Specialist. Second, Tilley made $25,000 before she started working at DEQ, while Patton made $68,619. The plaintiffs contend that Tilley and Patton "performed at the same level but for far different salaries." (ECF No. 43, at 22.) Thus, by paying Tilley less, DEQ undervalued Tilley's "seven years of experience at DEQ," which "should have more value, not less, than Patton's years of experience at a different job." (*Id.*) They further argue that a factfinder could determine the salary disparity persisted because DEQ failed to perform an internal salary alignment for Tilley.

The contemporaneous hiring paperwork makes clear that DEQ set Tilley's and Patton's salaries based on their respective prior salaries. (*Compare* ECF No. 40-3, at 78 (DEQ Ex. 3, Att. Z), *with id.* at 83 (DEQ Ex. 3, Att. BB).) DEQ, however, also asserts that it paid Tilley less due

---

[6] DEQ did not include a list of undisputed material facts regarding Patton. But because the parties do not seem to dispute the facts related to Patton's employment, the Court recites the facts based on the record attached to DEQ's motion.

to her minimal relevant work experience. Yet DEQ does not explain—and the record does not

show—why DEQ considered Tilley "entry-level" despite her prior coursework and work

experience or how that work experience compared to Patton's sufficient to warrant his "senior"

role. Thus, though the prior salaries explain part of the pay disparity, a question of fact remains

as to why Tilley's previous work did not warrant the same seniority level as Patton or a higher

salary. *See Earl v. Norfolk State Univ.*, No. 2:13CV148, 2016 WL 1078280, at *9 (E.D. Va. Mar.

17, 2016) ("[T]he record evidence, viewed in Plaintiffs' favor, supports an interpretation that the

[affirmative defense] explains only a portion of the total pay disparity."). DEQ's proffered factors,

therefore, only explain part of the pay disparity, not all of it. Accordingly, the Court will deny

DEQ's motion for summary judgment with respect to Tilley.

### D. *Sharon Allen, June Erwin, David Kinsey & Michael Kelly*

#### 1. *Facts*

##### a. *Sharon Allen*

Allen began working at DEQ as a Water Compliance Inspector in DEQ's Northern Virginia

Regional Office on June 25, 2005, with a starting salary of $41,000. (ECF No. 40 ¶ 11.a.) Before

starting at DEQ, Allen worked in a call center making $11.00/hour.[7] (*Id.* ¶ 11.b.; *see* ECF No. 43,

---

[7] The plaintiffs disagree with DEQ's contention that Allen's "starting salary . . . would
have been subject to the applicable DHRM pay factors, including prior salary history" because
they contend that this does not establish that DEQ actually set Allen's salary subject to her prior
salary or other DHRM pay factors. *See, e.g., Md. Ins. Admin.*, 879 F.3d at 123 ("[W]hile MIA
uses a facially gender-neutral compensation system, MIA still must present evidence that the job-
related distinctions underlying the salary plan, including prior state employment, in fact motivated
MIA to place the claimants and the comparators on different steps of the pay scale at different
starting salaries."). The plaintiffs also contend that DEQ did not timely identify "prior salary" as
a factor other than sex to explain the discrepancy between Allen's salary and those of her
comparators. As explained above, the Court does not find that DEQ failed to timely identify "prior
salary" in its FOTS Chart.

at 7 ¶ 4.)  Allen was making $51,885 annually when she received a competitive voluntary transfer

to a Petroleum Tank Inspector position ("Environmental Specialist II – Tank Inspector") effective

January 10, 2015.  Her salary increased to $54,500 (a five percent increase) after that transfer.

(ECF No. 40 ¶ 11.c; ECF No. 40-3, at 26-27 (DEQ Ex. 3, Att. D).[8])

      In total, between June 2005 and July 2022, Allen received fourteen pay increases—nine

General Assembly-passed salary increases, two career path adjustments (five percent), one five-

for-five state salary increase, and two competitive voluntary transfers.  (ECF No. 40 ¶ 11.f.)  As

of July 2022, Allen made $74,550.  (ECF No. 40-3, at 31 (DEQ Ex. 3, Att. F).)

### b. June Erwin

      Before working at DEQ, Erwin worked for the Commonwealth at Northern Virginia

Community College.  In February 2005, she began as an administrative office specialist, a Pay

Band 3 position, with a starting salary of $25,000.  (ECF No. 40 ¶ 12.a.)  In August 2005, Erwin

began as a VDSS Scholarship Specialist, making $29,000.  (*Id.* ¶ 12.b.)  By March 2007, she was

earning $35,880 when she accepted a role at DEQ as an Administrative Office Specialist III,

another Pay Band 3 position, making $37,750.  (*Id.* ¶¶ 12.a, c.)  In March 2019, DEQ reclassified

Erwin as an Environmental Specialist I (Administrative Data Coordinator Senior), a Pay Band 5

position that increased her salary to $52,444.  (*Id.* ¶ 12.d.)  In April 2019, DEQ promoted Erwin

to Tank Inspector (Senior), an "ES II" position, which increased her salary from $52,444 to

$55,066.  (*Id.* ¶ 12.e.) In July 2022, Erwin earned $63,746 annually.  (*Id.*)  In total, between August

---

[8] The plaintiffs argue that DEQ's cited attachment does not establish that it determined that
"DEQ reviewed the salaries of others in that position and determined that her salary was in line
with other Petroleum Tank Inspectors."  (ECF No. 40 ¶ 11.d; ECF No. 43, at 7 ¶ 5.)  They further
contend that Renee Wilson was not DEQ's HR Director in 2014" and therefore cannot opine about
DEQ's determinations during the hiring process.  (ECF No. 43, at 7 ¶ 5.)  But the hiring paperwork
for the transfer provides a list of the other salaries of individuals in the same or similar roles,
showing that DEQ reviewed other employees' salaries at the time of the employment action.  (ECF
No. 40-3, at 27 (DEQ Ex. 3, Att. D).)

2005 and July 2022, Erwin received eighteen salary increases—two promotions, one competitive voluntary transfer, two career path adjustments (five percent), two internal alignment salary adjustments, nine General Assembly-passed salary increases, one five-for-five statewide salary adjustment, and one upward role change salary increase.

### c. David Kinsey

Kinsey began working for a precursor agency to DEQ in 1987 as an Environmental Program Analyst with a starting salary of $21,889. (*Id.* ¶ 13.a.) In 1991, Kinsey made a lateral transfer to a Policy Analyst role for the Virginia Department of Air Pollution Control, another precursor agency of DEQ. (*Id.* ¶ 13.b.) His then-salary ($30,105) remained the same when he transferred. (*Id.*) In July 1996, "Kinsey became an Environmental Program Manager for DEQ," which increased his salary from $35,011.92 to $38,274. (*Id.* ¶ 13.c.)

In 2008, Kinsey took a leave of absence to perform military service.[9] (*Id.* ¶ 13.f.) When he returned in 2009, DEQ placed Kinsey in a Tank Inspector role because it had filled his prior position. (*Id.*) His annual salary remained at $56,894 (his salary before going on leave), as required by USERRA.[10] (*Id.*; ECF No. 40-3, at 48 (DEQ Ex. 3, Att. N).) By June 2019, Kinsey earned $78,078 annually. (ECF No. 40 ¶ 13.g.) He retired from DEQ in March 2021. (*Id.* ¶ 13.e.) Between July 1996 and June 2021, Kinsey received fourteen salary increases—eight General Assembly-passed salary increases, three increases following his military leave, one five-for-five statewide salary adjustment, and two career path adjustments (five percent). (*Id.* ¶ 13.g.)

---

[9] Based on Kinsey's pay history, he appears to have taken several leaves of absence to perform military service. The issues in this case center around Kinsey's 2008 leave of absence.

[10] USERRA provides that an employer must place a servicemember returning from leave in the same position or "a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2); *see also* 20 C.F.R. §§ 1002.191-94, 1002.236.

### d.  Michael Kelly

In 1993, Michael Kelly left his role as a principal geologist for the New Jersey Department of Environmental Protection ("NJDEP"), where he made $41,000 annually, to work for a precursor agency to DEQ as a geologist making $35,097 annually.  (*Id.* ¶ 14.a.)  Kinsey became an Enforcement Compliance Specialist for DEQ in 1999, a lateral transfer where his salary remained at $47,474.  (*Id.* ¶ 14.b.)  When Allen assumed the Tank Inspector Senior role in 2015 making $54,500, Kelly held a Inspector Senior II role and made $67,520.  (ECF No. 40-3, at 27, 54 (DEQ Ex. 3, Atts. D, Q).)  When Erwin assumed the Tank Inspector (Senior) role in April 2019 making $55,066, Kelly made $72,409.  (ECF No. 40-3, at 54 (DEQ Ex. 3, Att. Q).).  In July 2022, Kelly made $83,822.  (*Id.*)  In total, between November 1998 and July 2022, Kelly received sixteen salary increases—fifteen General Assembly-passed state salary increases and one five-for-five statewide salary adjustment.  (ECF No. 40 ¶ 14.b.)

### 2.  *Analysis*

### a.  *Allen, Erwin & Kinsey*

DEQ contends that the pay disparities exist between these plaintiffs and Kinsey when they each held a Tank Inspector position because Kinsey's military leave guaranteed him a certain baseline pay (his salary in his previous role) when he returned.  With respect to Erwin, the plaintiffs argue that DEQ did not pay Erwin the salary she deserved given her relevant experience when it first hired her, and DEQ "has sought to justify the men's salaries without any consideration whether their salaries should be aligned with women's."  (ECF No. 43, at 28-29.)  With respect to Allen, the plaintiffs argue that "Kinsey's history in the Commonwealth and the implications of his return from the military do not explain why her experience on the job did not bring Allen more in line with the salary of . . . Kinsey."  (*Id.* at 28.)

17

When Kinsey took the Tank Inspector Role after he returned from leave in 2009, Kinsey was in the same role that Erwin and Allen would eventually assume because DEQ had filled his previous role. He made $56,894. Yet nearly six years later, when Allen received a competitive voluntary transfer to a "Tank Inspector" position in 2015, her salary only increased to $54,500. And when DEQ promoted Erwin to Tank Inspector in 2019, she made $55,066 annually.

Even if USERRA required Kinsey's prior salary to act as a baseline, USERRA requires placing a servicemember in a job with comparable seniority, status, and pay if the employee does not have the servicemember's previous job available. *See* 38 U.S.C. § 4313(a)(2); 20 C.F.R. §§ 1002.191-94, 1002.236. DEQ has not argued that Kinsey took on a less complex or inferior position when he became a Tank Inspector, or that Kinsey performed a different job than Erwin and Allen. Notably, when DEQ promoted both Erwin and Allen, they did not maximize the salary increase allowed by DEQ policy at the time, which would have brought Allen's and Erwin's salaries far closer to Kinsey's starting salary in the role. (*See* ECF No. 43-6, at 8 (Pls.' Ex. 6) (stating in the 2005 DHRM Compensation Policy that, "[w]hen an employee competes for a different position in the same Pay Band, within the same or different agency, the employee's salary is negotiable from the minimum of the assigned Salary Range up to 15% above the current salary"); ECF No. 43-8, at 8 (Pls.' Ex. 8) (stating in the 2019 DHRM Compensation Policy that, "[w]hen an employee is promoted to a position in a different Role in a higher Pay Band, the promotion increase is negotiable from the minimum of the new Salary Range up to 15% of the current salary.").) At this juncture, considering the facts in the light most favorable to the plaintiffs, Kinsey receiving the same pay for a role comparable to his old position does not *in fact* explain why women doing that same job made less than his 2009 salary nearly six and eleven years later. *See Earl*, 2016 WL 1078280, at *13 (finding summary judgment improper "[b]ecause there is a chance,

18

however large or small it might be, that a reasonabl[e] jury could find in Plaintiffs' favor on the EPA claim") (quoting *Kennedy v. Va. Polytechnic Inst. & State Univ.*, 781 F. Supp. 2d 297, 301–02 (E.D. Va. 2011) (alterations in original). The Court, therefore, will deny DEQ's motion for summary judgment for Erwin and Allen with respect to their comparator, Kinsey.

### b. Erwin, Allen, and Kelly

Next, DEQ contends that Kelly's prior salary[11] and career path level explain his pay disparity with Erwin and Allen. The plaintiffs assert that Kelly's prior salary history does not explain why Allen's job experience did not bring her more in line with Kelly's salary, and that DEQ failed to consider whether Kelly's and Erwin's "salaries should be aligned." (ECF No. 43, at 28-29.)

DEQ has adequately explained that Kelly's prior salary at NJDEP established a higher-than-typical baseline, and his salary adjusted upward from there. Before Kelly became a Virginia state employee, he worked at NJDEP—the New Jersey equivalent of DEQ—which had a higher pay scale. (ECF No. 40-5, at 2, Bridgman Tr. 10:15-11:3 ("[T]he salaries in New Jersey . . . are higher than in the mid Atlantic. And so he came in like me earning well off the pay scale. . . . So he was hired two steps off the top of the pay band. . . . [H]e just was hired in at a high rate because of his prior salary.").) He began working for the State Water Control Board in January 1999. When Kelly made a lateral transfer into the Tank Inspection Program as an Enforcement Compliance Specialist, his salary remained at $47,474. After that transfer, he only received salary increases based on General Assembly-passed salary increases and a five-for-five statewide salary adjustment.

---

[11] The Court previously ruled that DEQ can use prior salary to explain a pay disparity. *See Abe v. DEQ*, No. 3:20-CV-270, 2021 WL 1250346 (E.D. Va. Apr. 5, 2021).

Moreover, when Allen and Erwin became senior-level Tank Inspectors, Kelly held a higher-career path level than them (Senior II), justifying the higher pay. (*See* ECF No. 40-3, at 27 (DEQ Ex. 3, Att. D).). Indeed, the record establishes that DEQ considered the Tank Inspector's salaries—including Kelly's—when they hired Allen, and that they hired Allen into a Senior role at a time when Kelly already held a Senior II role. (*See id.*) Although DEQ did not attach the pay action worksheets or other documentation for Erwin's promotion to Tank Inspector, Erwin assumed a senior Tank Inspector role four years after Allen did, and no one argues that Kelly did not still have his Senior II title. On this record, DEQ has established "that the proffered reasons *do in fact* explain the wage disparity," *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018), and the plaintiffs have failed to adequately rebut that conclusion. Accordingly, the Court will grant DEQ's motion for summary judgment as to Allen and Erwin with respect to their comparator, Kelly.

### E. *Elizabeth Abe, Ian Edwards & Jason McCroskey*

#### *1. Facts*

##### *a. Elizabeth Abe*

Abe started working for the Virginia Department of Transportation in December 2004, making $28,143. (ECF No. 40 ¶ 15.a.) She accepted a position as a Stormwater Compliance Specialist with the Department of Conservation and Recreation ("DCR") in the Abingdon DCR/Division of Soil and Conservation in July 2005, making $41,000. (*Id.* ¶ 15.b.) On June 25, 2013, Abe laterally transferred from DCR to DEQ when DEQ took over stormwater permitting, and her then-current salary of $47,960 remained the same. (*Id.* ¶ 15.d.) Abe became an "Environmental Specialist II" because of that transfer. (*Id.*) Abe resigned from DEQ in June 2021, when she was making $63,908. (*Id.* ¶ 15.f.) In total, after transferring to DEQ, Abe received six

20

salary increases between July 2013 and June 2019—four General Assembly-passed state increases, one in-band adjustment, and one career path adjustment increase of five percent (moved to senior). (*Id.* ¶ 15.d.)

### b. Jason McCroskey

Jason McCroskey began working for DEQ as an Environmental Specialist I, Water Monitoring Specialist, in April 2007, making $30,146 annually. (*Id.* ¶ 17.a.) He worked in the Southwest Regional Office in Abingdon, Virginia. (*Id.*) He received two salary increases in that role—one General Assembly-passed state salary increase and one career path adjustment that increased his pay by five percent. (*Id.*) On August 25, 2010, McCroskey—who at that point made $32,920—"received an Upward Role Change noted as a Job Reallocation/Promotion in the Water Program to a higher role and pay band as an Environmental Specialist II." (*Id.* ¶ 17.b; ECF No 40-3, at 63 (DEQ Ex. 3, Att. T).) His salary increased to $40,959 annually, and he became an exempt employee. (*Id.*) In that role, he received two salary increases—one five-for-five statewide adjustment and one career path adjustment that increased his pay by five percent. (ECF No. 40 ¶ 17.b.) McCroskey received a competitive voluntary transfer to an Environmental Specialist II (Water Inspector—Senior) role effective June 25, 2013. (*Id.* ¶ 17.c.) His salary increased from $45,157 to $49,673. (*Id.*) He received one General Assembly-passed state increase in that role. (*Id.*) Nearly two years later, in May 2015, McCroskey received a competitive voluntary transfer into the Stormwater program as an Environmental Specialist II (Inspector Senior—Stormwater). (*Id.* ¶ 17.d.) His salary increased from $51,056 to $55,000. (*Id.*) After transferring to the Stormwater Program role, McCroskey received five salary increases—three General Assembly-passed salary increases and two career path adjustments that increased his pay by five percent.

21

(ECF No. 40 ¶ 17.e.)  As of July 2022, McCroskey earned $74,432 annually.  (ECF No. 40-3, at 62 (DEQ Ex. 3, Att. T).)

### c.  Ian Edwards

In 1999, Ian Edwards began working as an Environmental Health Specialist, Senior, for the Virginia Department of Health ("VDH").  (ECF No. 40 ¶ 16.a.)  He worked as a rabies coordinator and made $25,881.  (*Id.*)  Edwards received a competitive voluntary transfer to VDH's Chesapeake Office on January 10, 2002, where he worked as an Environmental Specialist I, making $30,255.  (*Id.* ¶ 16.b.)  On January 10, 2006, Edwards started as an Environmental Specialist II, Stormwater Compliance Specialist, at DCR in Suffolk, Virginia, earning $41,639.  (*Id.* ¶ 16.c.)  In August 2010, DCR gave Edwards an internal salary adjustment increase to $49,451 effective August 25, 2010, due to his "outstanding" "performance in fulfilling . . . his own job as well as the E & S Inspector position."  (ECF No. 40-3, at 75-76 (DEQ's Ex. 3, Att. Y1).)  The pay action worksheet notes that "[w]ith this increase, Mr. Edwards would earn 3.4% below the average" Stormwater Compliance Specialists in the regional offices with nine years' experience even though Edwards had ten years' experience.  (*Id.* at 76.)

When Virginia consolidated DCR and DEQ effective June 25, 2013, DEQ moved employees in the Suffolk office to the Virginia Beach office.  (ECF No. 40 ¶ 16.d.)  DEQ increased Edwards's salary from $52,018 to $54,619 effective July 10, 2013, because Edwards's commute would "increase by 30-45 minutes unless he utilize[d] the toll roads which [would] increase his expenses considerably.  It [was] a good agency business need to give him a salary increase since he's an excellent employee and there they [we]re extremely short staffed."[12]  (ECF No. 40-3, at 68

---

[12] The plaintiffs dispute DEQ's references to the toll increases because "there wasn't a toll on the tunnel but it was indicated that it was going to be introduced."  (ECF No. 43, at 9 ¶ 15 (quoting Pls.' Ex. 5).)  The plaintiffs also argue that DEQ cannot justify the disparity based on the

(DEQ Ex. 3, Att. W); *see also* ECF No. 40 ¶ 16.d; ECF No. 43-5, Edwards Tr. 17:13-17 (Pls.' Ex. 5) ("I expressed some reservations and, you know, that's all. I just expressed that I would have to pay this toll in order to come into the office every day."); ECF No. 43-26, Wilson Tr. 40:22-25 (Pls.' Ex. 26) ("I remember talking to Mr. Edwards, and he was going to start looking elsewhere because of the extra commute that he had to do.").) On September 16, 2013, Edwards received an offer for a competitive voluntary transfer to the BRRO in Lynchburg, Virginia, as an Environmental Specialist II (Inspector Senior—Stormwater). (ECF No. 40-3, at 71 (DEQ Ex. 3, Att. X).) This transfer, effective October 10, 2023, increased his salary to $57,687 annually. (*Id.*)[13]

As of July 2022, Edwards earned $74,888 annually. (ECF No. 40 ¶ 16.f.) In total, between 1999 and July 2022, Edwards received twenty-two salary increases—twelve General Assembly-passed salary increases, one five-for-five statewide salary adjustment, three internal salary increase adjustments, one upward role change salary increase, one promotion, one competitive voluntary

---

increased commuting expense because Edwards received a competitive voluntary transfer to the BRRO in Lynchburg a few months later, and Edwards therefore never paid the toll. Neither argument convinces the Court that it should ignore the contemporaneous record, which indicates that in the face of a consolidation that required a well-performing employee to move offices, DEQ considered the burden that soon-to-be imposed tolls would place on that employee after he expressed some concerns about it. And the arguments ignore that the record shows that DEQ considered Edwards's increased commuting costs as compared to the other employees, who lived closer to Virginia Beach. Further, the plaintiffs have not pointed to any policy or other requirement that DEQ rescind this raise when Edwards's career plans changed.

[13] The plaintiffs dispute whether Edwards' move to BRRO was a "competitive voluntary transfer" because DEQ's then-current Compensation Policy did not allow competitive voluntary transfers within an agency. (ECF No. 43, at 9 ¶ 16.) The plaintiffs confuse "Competitive Salary Offer" with a "Voluntary Transfer." (*Compare* ECF No. 43-6, at 2, *with id.* at 6.) Under "Voluntary Transfer – Competitive," the DHRM policy explains that "[w]hen an employee competes for a different position in the same Pay Band, *within the same or different agency*, the employee's salary is negotiable from the minimum of the assigned Salary Range up to 15% above the current salary." (*Id.* at 8 (emphasis added).)

23

transfer, two retention salary increases, and one career path adjustment increase of five percent. (*Id.*)

### B. Analysis

#### 1. *Abe and McCroskey*

DEQ contends that the salary disparity between Abe and McCroskey existed due to McCroskey's competitive voluntary transfer, state salary increases, and career competency salary increases. The plaintiffs argue that in 2010, a time when Abe and McCroskey performed different roles, McCroskey received a 25% pay increase, which was more than DEQ's policy allowed and more than any plaintiff ever received. They also argue that "DEQ attempts to disguise the salary disparity between Abe and McCroskey as simply the result of McCroskey's receipt of additional pay in May 2015 as part of a competitive voluntary transfer to the same position as held by Abe." (ECF No. 43.) They assert that McCroskey's previous job did not make him more valuable than Abe because Abe had more stormwater compliance experience than McCroskey when he transferred jobs, and the subsequent career competency increases do not fully explain the disparity that continued until Abe separated from DEQ. Finally, they contend that DEQ "fail[ed] to periodically examine pay alignment, to be sure that men and women are paid equally when working equal jobs." (*Id.* at 28.).

As an initial matter, McCroskey received a 25% increase when he held a completely different role than Abe, and thus the increase does little to shed light on the reason for the salary disparity when Abe and McCroskey "performed equal work on jobs requiring equal skill, effort, and responsibility." *See Polak*, 57 F.4th at 429–30 (quoting *Spencer*, 919 F.3d at 203). McCroskey did not perform a comparable job to Abe until May 2015, when he received a competitive voluntary transfer to an Environmental Specialist II (Inspector Senior – Stormwater)—a senior

24

level position. The Court, therefore, will focus on McCroskey's career path starting in 2015. His salary increased to $55,000 a year when he received the transfer. At the time, Abe made $51,911. In February 2016, Abe received a career path adjustment to Senior, which put her at McCroskey's seniority level and increased her pay to $56,279—just below McCroskey's salary of $56,620 and higher than McCroskey's starting salary at that level. (ECF No. 40-3, at 9 ¶ 33; *id.* at 56, 62, 64 (DEQ Ex. 3, Atts. R, T).) In other words, less than a year after McCroskey's transfer, once Abe held the same seniority level as McCroskey's, Abe's salary became near-equal to McCroskey's salary and higher than his starting salary at that level. DEQ, therefore, has met its burden as to McCroskey.

### 2. *Abe and Edwards*

DEQ contends that the pay disparity exists between Abe and Edwards because DEQ gave Edwards an internal salary adjustment in 2010, which pushed his salary above Abe's salary. Edwards made $41,639 when he transferred to DCR in Suffolk, and DCR promoted him to Environmental Specialist II, Stormwater Compliance Specialist. His salary fell below Abe's salary of $42,230 in the same role at the Abingdon office. But when Edwards received the August 2010 internal salary adjustment to $49,541 for performing two roles, his salary moved above Abe's salary of $45,676. And, when DCR and DEQ consolidated, Edwards received a salary increase to cover the anticipated tolls that would shorten his commute "to increase the potential of retaining" Edwards, an "excellent employee" in an office where "they [were] extremely short staffed," (ECF No. 40-3, at 68 (DEQ Ex. 3, Att. W)), while Abe did not receive a similar increase because "[s]he was just a mediocre employee," (ECF No. 43-26 (Pls.' Ex. 28) (Hawkins Tr. 44:11-12)). In October 2013, Edwards received a competitive voluntary transfer to the BRRO as an

25

Environmental Specialist II—Inspector Senior—Stormwater, with a salary increase to $57,687. Abe's salary never caught up to Edwards's salary.

The plaintiffs focus on the 2013 salary increase to cover Edwards's commuting costs and his 2013 competitive voluntary transfer. In essence, the plaintiffs contend that DEQ did not verify that Edwards would *actually* pay a toll because the Commonwealth did not introduce tolls until 2014. And Edwards transferred to a different office before the tolls took effect, making the increase unnecessary. The plaintiffs also suggest that Wilson's declaration demonstrates pretext because she referred to Edwards's salary increase as a "retention salary increase" rather than an increase to cover higher commuting costs and because DEQ did not investigate the "false claim for the expense of tolls at the Midtown Tunnel in Norfolk." (ECF No. 44, at 2.)

The pay action worksheets for Edwards set forth the exact reasons for Edwards's pay raises articulated by DEQ, (ECF No. 40-3, at 68 (DEQ Ex. 3, Att. W)), and the plaintiffs' arguments do not rebut these defenses. DEQ documented that it gave Edwards more money to cover his commute because he was an excellent employee and it feared losing him due to the added burden the commute imposed, particularly in light of the added costs of the anticipated tolls. Abe, on the other hand, did not receive a similar increase because "[s]he was just a mediocre employee." (ECF No. 43-26 (Hawkins Tr. 44:11-12).)    Additionally, as explained above, when deciding to give Edwards a pay increase for the tolls, DEQ noted that the other employees moving to the Virginia Beach office lived closer to that office, so the new commute presented less of a burden. (ECF No. 40-3, at 68 (DEQ Ex. 3, Att. W).)   The plaintiffs do not contend that Abe faced the same commuting time or expenses as a result of the office consolidation. The fact that Edwards made comments about the tolls in passing and did not ultimately pay the tolls, or that DEQ did not sufficiently verify that he would pay the tolls, does not change that the record clearly shows DEQ

26

chose to increase Edwards's salary to cover the tolls that both DEQ and Edwards anticipated coming into effect imminently. *See Spencer*, 919 F.3d at 207 (explaining that the Court must take care not to act as "a 'super-personnel department weighing the prudence of employment decisions' made by the defendants" (quoting *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005)).

They also argue that Edwards's transfer to the BRRO did not qualify as a competitive voluntary transfer because he transferred for personal reasons. (ECF No. 43, at 9, 26.) The fact that Edwards transferred to the BRRO for personal reasons does not negate that he received a competitive voluntary transfer. The plaintiffs do not point to any provision in the DHRM Compensation Manual or cite any Fourth Circuit or Supreme Court case requiring a person to move offices for purely professional reasons. In sum, DEQ has met its burden with respect to Edwards, and the Court will grant DEQ's motion for summary judgment as to Abe and Edwards.[14]

### III. CONCLUSION

For the foregoing reasons, the Court will deny the plaintiffs' motion to strike but will direct limited, additional discovery regarding Kinsey's USERRA status and military leave. It will grant DEQ's motion for summary judgment as to Abe in its entirety and as to Allen and Erwin with respect to Kelly. But it will deny DEQ's motion as to Tilley and as to Allen and Erwin with respect to Kinsey.

---

[14] The plaintiffs also make several general arguments regarding DEQ's purported failure to attach certain documents to its motion and urging the Court to read certain requirements into the EPA and Fourth Circuit precedent. The Court has reviewed the arguments, the record, and relevant caselaw, and it does not find those general arguments persuasive. The Court declines to revisit its prior rulings, and the plaintiffs have otherwise failed to establish that binding precedent supports their arguments.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: _August 11,_ 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

28